IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELLIOT VELEZ and ALFONSO ORTIZ, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO and CHARLES BURNS, <br><br> Defendants. | Case No. 03 C 4437 <br><br> HONORABLE CHARLES R. NORGLE |

**OPINION AND ORDER**

CHARLES R. NORGLE, Sr., District Judge

Before the court is Defendants' Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56(b). For the following reasons, Defendants' Motion for Summary Judgment is granted.

**I. BACKGROUND[1]**

**A. Facts**

This case arises out of an employment demotion of two employees of the Defendant City of Chicago's Fire Department ("CFD"). Plaintiff Elliot Velez ("Velez") was hired by the CFD in 1982 as a paramedic, and Plaintiff Alfonso Ortiz ("Ortiz") was hired in 1977 as a firefighter. The CFD has approximately 5,000 employees, 7 Districts, 24 Battalions, and 99 Engine Companies. See http://www.cityofchicago.org/Fire. (visited July 1, 2005).

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and notes disputed facts within the text.

1

To fully understand the facts of this case, a brief description of the CFD's employment structure is necessary. Within the CFD, there are two types of uniformed employees: the firefighter chain of command and the paramedics chain of command. Under the firefighter chain, a firefighter is the lowest ranking officer, followed by the Engineer, Lieutenant, Captain, Battalion Chief, Deputy District Chief, District Chief, Assistant Deputy Fire Commissioner, Deputy Fire Commissioner, First Deputy Fire Commissioner, and Fire Commissioner. The ranks for the paramedics start with the Paramedic, followed by the Paramedic-in-Charge, Ambulance Commander and EMS Field Officer, Deputy Chief Paramedic, Deputy Fire Commissioner, First Deputy Fire Commissioner, and Fire Commissioner.

When uniformed employees of the CFD complete their probationary period, they are assigned a "career service rank." In the firefighter chain of command, this rank is earned through promotional examinations, as opposed to the paramedics service, where promotions are earned through seniority. Outside of the career service ranks are "exempt" ranks. An exempt rank status does not imply a supervisory role within the CFD, it can be administrative in nature. The Fire Commissioner is the only person who can appoint or remove an employee from the exempt ranks. An exempt ranked employee can be returned to his career service rank at the Commissioner's discretion.

In 1988, Velez had earned the career service rank of Paramedic Field Officer. That same year, he was appointed Coordinator of Community Services by Former Fire Commissioner Galante. As Coordinator of Community Service, Velez was CFD's liaison for the First Aid Care Team ("FACT") program. The FACT program provides basic life support services, including emergency medical technical training to public housing residents in the Chicago Housing Authority ("CHA"). CFD delegated Hull House Association, through a contract with the City of Chicago, to administer the

FACT program. Participants in the program can receive tuition reimbursements for paramedic training from the City of Chicago.

Velez's responsibilities included collection "run sheets," reports of services provided to the University of Chicago Hospitals, which provided medical oversight for the FACT program, as well as provided medical supplies to the various FACT stations in the city. Velez was also responsible for the approval of the tuition disbursements to participants in the FACT program, as well as the disbursement of funds allotted to the CFD for use in the FACT program.

In 1988, Ortiz was appointed Assistant Coordinator of Community Services, and was assigned to the Community Services Division by former Commissioner Galante. As the Assistant Coordinator, Ortiz aided Velez in his duties and responsibilities with the FACT program. Since 1997, the FACT program was under the chain of command of Deputy Fire Commissioner John Ormond ("Ormond").

Plaintiffs allege that, beginning in 1997, Burns harassed them by requiring Ortiz and Velez to perform menial tasks at the CFD's Public Education Unit ("PEU"). Such tasks included cleaning up before and after classes held in the unit, washing dishes, and janitorial services. Velez concedes that Charles Burns ("Burns"), a Deputy Fire Commissioner primarily asked Ortiz to complete these tasks, and that all members of the PEU were asked to clean up the kitchen. Furthermore, Ortiz concedes that maintenance of the exterior and interior of the Public Education Officers were part of his job description.

In addition to Burns' orders to perform these tasks, Plaintiffs allege that Burns took away their responsibilities and privileges in running the FACT program. Specifically, Plaintiffs claim that their cellular phones were taken away, certain work files were seized, and both Velez and Ortiz were forbidden to contact anyone in the FACT program. In February 1997, Burns prohibited Velez and Ortiz from speaking Spanish at meetings where non-Spanish speaking persons were present. Plaintiffs

3

also allege that Burns denied their request to purchase a vehicle for the FACT program, and said he "didn't care how heavy your [profanity] Hispanic clout is, you can't do a [profanity] thing about it."

Additionally, Velez and Ortiz claim that on three separate occasions Burns stated "God damn Puerto Ricans, they think they run this unit." When Velez and Ortiz complained about their working conditions, Burns purportedly said, "If you don't [profanity] like it here, I can get you kicked out of this [profanity] unit. You will lose your [profanity] job." In February 1997, Velez complained to Chief Charles Stewart ("Stewart"), Direct of Personnel at the CFD. Stewart told Velez that he should see the Fire Commissioner.

Then, in April 1997, Burns and Velez went to Velez's home after Velez reported to work one morning. Burns spoke to Velez and his wife, where Burns claimed that Velez had come to work intoxicated, and that his job was in jeopardy. Velez claims that he was sick that day, and may have taken cold medication. Velez also stated that Burns accused him of drinking on the job at least ten times. However, in December 1997, Velez tested positive for alcohol after being asked to take a drug test when reporting to work. As a result, Velez entered into an agreement which stayed his termination if he successfully completed one year of random testing. Finally, in January 1998, Velez was reassigned to the Fire Prevention Bureau Headquarters, where Velez alleged that Deputy Commissioner Kenneth Wideman ("Wideman") ordered him to report to both a Lieutenant and a civilian.

Velez and Ortiz considered themselves demoted as of March 1997, when Burns told all personnel that Velez and Ortiz were out of the chain of command, and nobody was to report to them. Then, in May or June 1997, Velez allegedly reported Burns' behavior to Assistant Deputy Fire Commissioner Wideman, and Ormond. According to Velez, both Wideman and Ormond acknowledged that they were aware of Burns' actions, yet did not take any specific action. However,

neither Velez nor Ortiz complained to Wideman and Orman about any specific harassment based on race or national origin, or the existence of a hostile work environment. Furthermore, Ormond did not allow Ortiz or Velez to complain directly to the Fire Commissioner. Instead, Ormond required Plaintiffs to follow department procedure and file a written complaint pursuant to General Order 93-018. In the CFD, all employees who feel that have been harassed must file a complaint under this general order. "Pursuant to this Order, any employee who believes that he or she is the victim of discrimination or harassment must make a complaint in writing to their supervisor or the department's Assistant Director of Personnel." Plaintiffs never filed a complaint under General Order 93-018.

Ortiz claimed that Burns' treatment towards him was equally hostile. Ortiz alleged that Burns moved him to a smaller officer that did not contain a telephone or any office equipment. In addition, Ortiz claims that Burns went with him to the city's graphic print shop and asked another Hispanic worker to check Ortiz's translation of CFD literature. Furthermore, Ortiz claims that several times each week, between January and June 1998, Burns had Ortiz take Burns' CFD car for maintenance. Also, Ortiz claims that once in December 1997, Burns ordered Ortiz to cook Christmas dinner for the unit.

Burns noted in a memo dated March 31, 1997 that Velez did not attend FACT meetings, and, according to Burns, Velez was inattentive to the FACT program. Burns also believed that Velez ignored requests by the University of Chicago, for FACT program run sheets. Then, in February, 1998, Ormond became aware of Velez's and Ortiz's performance issues from Tanja Ancrum ("Ancrum"), the financial director of CFD. Ancrum and Velez worked togther on the FACT budget. In a memorandum dated February 19, 1998, Ancrum indicated that Velez and Ortiz did not approve tuition reimbursement for paramedic training for three years, Velez told Hull House that he would not reimburse the cost for the training program, and told CFD's finance division that he would use the

5

funds, but failed to do so.

Furthermore, Ancrum believed that Velez and Ortiz handled FACT program funds inappropriately by spending funds on non-FACT parties, telling Hull House to spend its own money for purchases that should have been covered by the CFD. Ancrum also stated that Velez and Ortiz misrepresented the City to Hull House personnel, did not assist Hull House in preparing its budget, and submitted FACT program budgets with insufficient justification. Lastly, Ancrum believed that Velez and Ortiz were apparently dishonest in an attempted purchase of a vehicle.

Based on these memos from Ancrum and Burns, Ormond drafted a memorandum to Fire Commissioner Altman in which he requested that Velez be demoted to his career service rank of Paramedic Field Officer. The City alleges that Ormond initially did not request Ortiz be returned to his career service rank, however Ormond later changed his recommendation to include such a request.

In response to Ormond's recommendations, Altman ordered Deputy Commissioner Kathryn Nelson ("Nelson"), and Chief Philip Stelnicki ("Stelnicki") to review the allegations contained in Ormond's memorandum, and report if these statements were well founded. Nelson and Stelnicki stated that they interviewed several CFD and Hull House employees, and reviewed documents relating to the FACT program. Nelson and Stelnicki concluded that Ormond had a well-founded basis for his report and recommendation.

As a result, on June 1, 1998, Former Commissioner Altman returned Velez to his career service rank of Field Officer, and Ortiz was returned to his career service rank of Firefighter. Velez was reassigned to the Emergency Medical Services Division, and Ortiz was placed with Truck 47 Company

as a firefighter. Ortiz eventually retired from the CFD in 1999[2], and Velez is currently employed as a Paramedic Field Officer.

## B. Procedural History

On June 26, 2003 Plaintiffs filed their Complaint, alleging violations of Title VII, 42 U.S.C. § 2000e, *et seq*, specifically, discrimination based on race and national origin, the creation of a hostile work environment, and a constructive discharge claim. Defendants filed their Motion for Summary Judgment on October 1, 2004, Plaintiffs filed their Response on November 1, and Defendants filed their Reply on November 15, 2004. Defendants' Motion for Summary Judgment is fully briefed and before the court.

## II. DISCUSSION

## A. Standard of Review

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See Fed. R. Civ. P.

---

[2]The court notes that Ortiz gives two separate dates for his constructive discharge. The first is November 24, 1999, Pl.'s Stmt. of Mat. Facts, ¶ 79, and the second is in 2000. Compl., ¶ 34.

7

56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all inferences in a light most favorable to the non-moving party. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

## B. Velez's and Ortiz's Claims under Title VII[3]

### 1. Racially Hostile Work Environment

Under Title VII, employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). Courts have interpreted this statute to prohibit employers from forcing employees to "work in a discriminatory hostile or abusive

---

[3]The Complaint does not list any counts, it merely states that Defendants's actions violated his "federally protected rights and constitute harassment and discrimination on the basis of national origin in violation of Title VII," and that Defendants' actions created a "hostile work environment." Compl., ¶¶ 30-31.

8

environment." Shanoff v. Ill. Dept. of Human Serv., 258 F.3d 696, 701 (7th Cir. 2001) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Workplace discrimination in the form of "'intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'" violates Title VII. Harris, 510 U.S. at 21 (citations omitted) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); see also Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1048 (7th Cir. 2000). "By its terms, this provision of Title VII proscribes only workplace discrimination . . . it is not a 'general civility code' designed to purge the workplace of all boorish or even all harassing conduct." Berry v. Delta Airlines, Inc., 260 F.3d 803, 808 (7th Cir. 2001).

To survive summary judgment on a hostile work environment claim, a plaintiff is "required to establish that: (1) he was subjected to unwelcome harassment, (2) the harassment was based on his race, (3) the harassment was severe and pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability." Beamon v. Marshall & Ilsley Trust Co., -- F.3d --, Nos. 04-1521 & 04-2263, 2005 WL 1399307, at *8 (7th Cir. June 15, 2005) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 713 (7th Cir. 2004)). "A plaintiff bringing a hostile environment claim must establish that the workplace was both subjectively and objectively offensive." Ezell v. Potter, 400 F.3d 1041, 1047 (7th Cir. 2005) (citing Rogers v. City of Chicago, 320 F.3d 748, 752 (7th Cir. 2003)). "A workplace is objectively offensive when a reasonable person would find it hostile or abusive considering all the circumstances." Id. Factors relevant to determine whether the workplace is objectively offensive include: "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Moser v. Indiana Dept. of Corrections, 406 F.3d 895, 902 (7th Cir. 2005) (quoting Saxton v. American Tel. &

9

Tel. Co., 10 F.3d 526, 534 (7th Cir. 1993)). The workplace is "subjectively hostile when the worker actually perceives it as such." Ezell, 400 F.3d at 1048 (citing Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807 (7th Cir. 2000)). "The workplace that is actionable is the one that is hellish." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997).

Furthermore, an employer is liable if either the plaintiff's supervisor created the hostile work environment, Mason v. S. Ill. Univ., 233 F.3d 1036, 1043 (7th Cir. 2000) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998), or a co-worker created the hostile work environment, and the employer was "negligent either in discovering or remedying the harassment." Mason, 233 F.3d at 1043; Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998). With these principles in mind, we turn to Velez's and Ortiz's claims.

First, Plaintiffs cannot establish that they were in fact subjected to harassment that a reasonable person would find hostile or abusive. See Ezell, 400 F.3d at 1048; see also Murray v. Chicago Transit Auth., 252 F.2d 880, 889 (7th Cir. 2001) (to be actionable as creating a hostile work environment under Title VII, the conduct must have the purpose of effect of unreasonably interfering with an employee's work performance, or creating an intimidating. . . work environment). The actions by members of the CFD that Velez and Ortiz enumerate in their Complaint do not rise to the level of an objectively hostile work environment. See Walker v. Mueller Industries, Inc., 408 F.3d 328, 334 (7th Cir. 2005).

For instance, Velez and Ortiz claim that in December 1996 when Burns became the supervisor, he ordered the men "on a daily basis to perform menial tasks such as cleaning bathrooms, sweeping and mopping floors, dusting, gardening, washing dishes, delivery and pick up of supplies, and such other chores." Compl., ¶ 14. Additionally, Velez and Ortiz allege that Burns prohibited them from

10

speaking Spanish while at meetings with non-Spanish-speaking co-workers, that Burns swore at both Velez and Ortiz on at least two separate occasions, and that Ortiz was ordered by Burns to take in his car for maintenance. Pl.'s Stmt. of Mat. Facts, ¶¶ 49, 51. Ortiz admits that "maintaining orderliness and cleanliness of the interior and exterior Public Education Offices was part of his job." Id., ¶ 48. The court fails to see how a hostile work environment was created when Burns told Ortiz to do a job he was already responsible for in the first place.

Second, neither Velez or Ortiz has submitted evidence that demonstrates that the harassment was based on race or national origin. In order to support their assertion, Velez and Ortiz allege that Burns swore at them on several occasions. Some of his statements include: "[N]obody [profanity] with Charlie Burns," Pl.'s Stmt. of Mat. Facts, ¶ 51, "If you don't [profanity] like it here, I can get you kicked out of this [profanity] unit," Id., ¶ 54, and "I don't care how heavy your [profanity] Hispanic clout is, you can't do a thing about it." Id., ¶¶ 52-53. Assuming Burns actually made these statements, at most they amount to stray remarks. A handful of comments, only one of which references both Plaintiffs' nationality, is insufficient to establish the second element of a hostile work environment claim. See Ezell v. Potter, 400 F.3d at 1047; see also Tutman, 209 F.3d at 1048. While Burns' remarks may be insensitive and boorish, they itself do not establish that any alleged discrimination was based on Velez's or Ortiz's race. See Berry, 260 F.3d at 808.

Third, there is no evidence in the record to suggest that the alleged harassment suffered by Ortiz and Velez was so pervasive that it altered their work environment. Standing alone, the facts do not support the claim that the work environment at the CFD was so "hellish" that neither Velez or Ortiz could continue to work there. See Walker, 408 F.3d at 333; see also Beamon, - - F.3d, at - - , 2005 WL 1399307 at *8. For instance, Velez and Ortiz allege that Burns did not allow them to speak Spanish at meetings because there were non-Spanish speaking people present. That does not amount

11

to a hostile work environment, it is merely respectful of other employees who may feel left out of a discussion. Neither Velez or Ortiz has submitted evidence to demonstrate an inability to perform their job adequately without speaking Spanish. Presumably both of these men were able to speak English, by virtue of the fact that they worked in the CFD beginning in the 1980s.

Lastly, the court does not find there was any basis for employer liability. Velez and Ortiz allege that Burns was a supervisor, and as a result, his actions are imputed to the CFD. "A supervisor is someone with the power to directly affect the terms and conditions of the plaintiff's employment." Rhodes v. Ill. Dept. of Transportation, 359 F.3d 498, 506 (7th Cir. 2004). "'Supervisor' is a legal term of art for Title VII purposes, and an employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." Id.

Here, Burns merely oversaw the day to day aspects of Velez's and Ortiz's work. He did not have the final authority to hire, fire, demote, transfer, or discipline either of the two men. See Def.'s Stmt. of Mat. Facts, ¶ 67. It was Former Commissioner Altman who made the final decision to return Velez and Ortiz to their career service ranks, not Burns. Id., ¶ 44. Furthermore, neither Velez nor Ortiz submit evidence to demonstrate that their actual supervisor, Former Commissioner Altman, took actions to create a hostile work environment. Specifically, there is no evidence that Altman took Velez's or Ortiz's nation origin into consideration when he demoted them.

Velez and Ortiz submit no evidence to establish that Former Commissioner Altman had knowledge of Burns's alleged harassment. Neither Velez nor Ortiz filed a complaint pursuant to General Order 93-108. Both men allege that they were unable to file their complaint through the usual chain of command enumerated in the Order. However, under the same order, Velez and Ortiz were able to report their complaints in writing to the Assistant Director of Personnel. They did not do this either. Def.'s Stmt. of Mat. Facts, ¶ 78. Instead, Velez made general remarks about his employment

to Charles Stewart III, the Director of Personnel, instead of filing a specific written complaint regarding harassment or a hostile work environment.

"The relevant inquiry is therefore whether the employee adequately alerted her employer to the harassment, thereby satisfying her obligation to avoid the harm, not whether she followed the letter of the reporting procedures set out in the employer's harassment policy." Cerros v. Steel Technologies, Inc., 398 F.3d 944, 952 (7th Cir. 2005); see Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 806 (compliance with an employer's designated complaint procedure is not the sole means by which any employee can fulfill her duty to avoid harm). Because Velez and Ortiz did not adequately alert any of their supervisors of the alleged harassment within their unit, or file a complaint under the CFD's Genera Order, knowledge of Burns's alleged misconduct cannot be imputed to CFD supervisors. See Perry, 126 F.3d at 1014 (No Employer liability under Title VII for manager's sexually harassing statements to subordinate, where employee conceded she never reported harassment. . . despite employer's written and verbal anti-harassment policies). The City did not have notice of the alleged harassment, and as a result, could not respond in an adequate and timely manner. See Cerros, 398 F.3d at 952

Construing the evidence in light most favorable to the CFD, there are no genuine issues of fact, nor are there any inferences the court must make as to whether a hostile work environment existed. See Szymanski, 231 F.3d at 364. As a result, summary judgment is proper in favor of the City as to Velez's and Ortiz's hostile work environment claim.

### 2. Discrimination Based on National Origin

Velez and Ortiz fail to establish a genuine issue of material fact as to whether they were discriminated against because of their national origin, when they were demoted, and replaced by an African-American woman. A plaintiff must prove the alleged discrimination either through direct

13

evidence of discrimination, or through the indirect, burden-shifting method. See Jordan v. Summers, 205 F.3d 337, 342 (7th Cir. 2000); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Direct evidence is evidence that shows the employer's intent without the need to rely on "inference or presumption." Bahl v. Royal Indem. Co., 115 F.3d 1283, 1290 n.6 (7th Cir. 1997). Direct evidence "speak[s] directly to the issue of discriminatory intent, [and] also relate[s] to the specific employment decision in question." Oates v. Discovery Zone, 116 F.3d 1161, 1170 (7th Cir. 1997). It is likely the case that the only real direct evidence of discriminatory intent is an admission by the employer. Logan v. Kautex Textron N. Am., 259 F.3d 635, 638 (7th Cir. 2001); Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994). Plaintiffs claim to have direct evidence of discrimination, but the statements submitted do not demonstrate a discriminatory intent, nor do they speak to any specific employment decision. See Pl.'s Resp. to Def.'s Mot. for Summ. J., at 11. Therefore, Plaintiffs must rely on the indirect burden-shifting framework of McDonnell Douglas.

Under the indirect burden shifting framework, a plaintiff must show that: (1) he belongs to a protected class, (2) he performed his job satisfactorily, (3) he suffered a materially adverse employment action, and (4) his employer treated similarly situated employees outside the protected class more favorably. O'Neal v. City of Chicago, 392 F.3d 909, 911 (7th Cir. 2004). If the plaintiff can establish these four elements, then the burden shifts to the defendant to submit a legitimate, non-discriminatory reason for its actions. Id; McDonnell Douglas, 411 U.S. at 802. After the Defendant does so, the "plaintiff must present sufficient evidence to create a triable issue concerning whether the justification is pretextual." O'Neal, 392 F.3d at 911 (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 508 (1993)).

First, it is undisputed that both Velez and Ortiz are members of a protected class, because they are both of Puerto Rican origin. It is also undisputed that both Velez and Ortiz suffered an adverse job

14

action when they were both demoted to the career service rank. However, it is under the second and fourth prong that Velez and Ortiz encounter some difficulty. Under the second prong, neither of the men can show that they had performed their jobs satisfactorily. Plaintiffs also claim that they were demoted to the career service rank because of their national origin. Compl., ¶ 30. The facts, however, paint a different picture. The record is replete with reports detailing both Velez's and Ortiz's poor job performance. For example, Ancrum's memo to Ormond in February 1998 stated that the FACT program funds were being mishandled and misappropriated. Def.'s Stmt. of Mat. Facts, ¶¶ 34, 37. Velez and Ortiz were in charge of the FACT program. Additionally, Defendants have submitted evidence of an investigation by two employees of the CFD into allegations of abuse and mishandling of the FACT budget by Velez and Ortiz. Id., ¶42. Nelson and Stelnicki prepared a report which confirmed that Velez and Ortiz had misappropriated Hull House funds, failed to attend meetings, and did not perform their jobs as required. Id., ¶¶ 40, 41, 43. As a result of these reports, Deputy Commissioner Altman demoted Velez and Ortiz. The record therefore clearly states that the sole reason for Velez's and Ortiz's demotions were based on their poor work record, not their national origin.

Fourth, Plaintiffs cannot establish that similarly situated employees were treated differently. Similarly situated does not mean two employees have similar jobs; the employees must be directly comparable to the plaintiff in all material aspects. Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). Factors relevant to determine whether an employee is similarly situated include performance, qualifications, and conduct. See Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000).

To support their claim, Velez and Ortiz state that non-Hispanic employees received favorable treatment. These employees were: John Brogan ("Brogan"), Paramedic In Charge Sandra Rout

15

("Rout"), Paramedic in Charge Joseph Roccasalva ("Roccasalva"), and Engineer Lolita Travis ("Travis"). Pl.'s Stmt. of Mat. Facts, ¶¶ 71-74. However, Plaintiffs are not similarly situated to the named employees for several reasons. First, Plaintiff's admit that "while some of their duties were dissimilar, many of their duties and circumstances of employment overlapped." Pl.'s Stmt. of Mat. Facts, ¶¶ 71-74. That alone is sufficient to find that these employees are not similarly situated to the Plaintiffs. See Patterson, 281 F.3d at 680. Second, none of these employees were exempt rank employees, like Velez and Ortiz. Def.'s Stmt. of Mat. Facts, ¶ 71. Third, there is no evidence that any of these employees were in charge of, or had significant oversight on the FACT program, or its budget. According to Velez and Ortiz, "Travis, Roccasalva, and Rout did both educational programming for the city, and administrative tasks at the Public Education Unit." Id. While both Plaintiffs and these employees had the same general tasks, their job descriptions were not so closely related as to satisfy the similarly situated standard. See Patterson, 281 F.3d at 680. Velez and Ortiz worked in the FACT program, while Travis, Roccasalva, and Rout did not. Velez and Ortiz had a different level of responsibility; they were in charge of the budget for the FACT program. Brogan, for example, was primarily responsible for the administration of the Public Education Unit, and had no involvement with the FACT program. Def.'s Stmt. of Mat. Facts, ¶ 71. Even though they did "educational programming for the city," it was not materially related to Velez's and Ortiz's job description. See Patterson, 281 F.3d at 680. As a result, Velez and Ortiz have not demonstrated that similarly situated employees were treated in a more favorable manner.

### 3. CFD's legitimate reason for Velez's and Ortiz's termination

Despite Plaintiffs' failure to establish each element of their discrimination claim, with an abundance of caution, the court will analyze the burden-shifting analysis of Defendants' Motion for Summary Judgment.

16

Assuming, *arguendo*, that Velez and Ortiz could establish a prima facie case of discrimination, the burden shifts to the CFD to "articulate a non-discriminatory justification for the action." O'Neal, 392 F.3d at 911. Here, the CFD has submitted two separate reports in which supervisors had conducted investigations into how Velez and Ortiz handled the FACT budget, including their alleged misuse of FACT program funds, to demonstrate that the adverse job action was not based on national origin. Moreover, Burns did not have the authority to alter Velez's or Ortiz' jobs. Commissioner Altman reassigned both Velez and Ortiz, almost 17 months after the alleged harassment. Def.'s Stmt. of Mat. Facts, ¶ 67. While Burns may have made use foul language and acted in a boorish manner, Velez and Ortiz submit no evidence to indicate that Commissioner Altman was motivated by a discriminatory animus in his action. In fact, the CFD has established, through these investigations, that the sole reason for Velez's and Ortiz's demotion was their poor job performance. Therefore, the CFD has established a legitimate, non-discriminatory reason for the demotion of Velez and Ortiz.

### 4. *Velez's and Ortiz's Pretext Argument*

After CFD has established its legitimate reason for termination, Velez and Ortiz are required to show that the proffered reason is pretextual. See Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000); see also Herron v. DaimlerChrysler, 388 F.3d 293, 301 (7th Cir. 2004). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." Stewart, 207 F.3d at 378 (quoting Jackson v. E.J. Brach Corp., 176 F.3d 971, 983 (7th Cir. 1999)). The court will not "sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision." Id. Moreover, it is not sufficient to prove that the reason was doubtful or mistaken. Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 541 (7th Cir. 1998). Pretext does not mean simply a mistake, but instead a lie, "specifically a phony reason for some action." Id (quoting Johnson v. City of Fort Wayne, 91 F.3d 922, 931 (7th Cir.

17

1996)). The only concern is whether the legitimate reason provided by the CFD is in fact an honest one. See Stewart, 207 F.3d at 378.

The CFD has already set forth specific reports that cited problems in the FACT program, and specifically, the misappropriation and mishandling of FACT funds by both Ortiz and Velez. See Def.'s Stmt. of Mat. Facts, ¶¶ 34-40. Commissioner Altman even ordered an investigation into these allegations, which resulted in the report that eventually led to Ortiz's and Velez's demotions. Both Plaintiffs, on the other hand, have submitted no evidence that demonstrates Altman had a discriminatory reason, separate from Velez's and Ortiz's poor job performance, that served as the motivation for the reassignment of the two men. It is irrelevant if the initial allegations were true or not. Stewart, 207 F.3d at 378. The only inquiry is whether the "employer's stated reason was honest." Id. Based on the reports and memorandums submitted by the CFD, it cannot be said that the reason for Velez's and Ortiz's demotion was a "phoney reason for some action." Crim, 147 F.3d at 541. As a result, no genuine issue of material fact exists, and summary judgment is proper as to the CFD on the discrimination claim.

### 5. *Ortiz's Constructive Discharge Claim*

Lastly, Ortiz alleges that he was constructively discharged from the CFD when he took voluntary retirement. In order to establish a claim or constructive discharge, an employee must show both that: (1) a hostile work environment existed, and (2) "that the abusive working environment became so intolerable that her resignation qualified as a fitting response." Rooney v. Koch Air, LLC, -- F.3d --, 2005 WL 1324831 (7th Cir., June 6, 2005); Pennsylvania State Police v. Suders, 124 S.Ct. 2343, 2346 (2004). "The working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the 'ordinary case' an employee is

18

expected to remain employed while seeking redress." Robinson v. Sappington, 351 F.3d 317, 336 (7th Cir. 2003), *cert. denied*, 124 S.Ct. 2909 (2004); see Tutman, 209 F.3d at 1048.

Ortiz states that he was "sent back to the Fire Academy but not trained. He was washing buggies and getting gas," Pl.'s Stmt. of Mat. Facts, ¶ 88, and that after Ortiz's demotion, "he continued to be overwhelmed with embarrassment and humiliation, and after 17 months of trying to cope, was forced to resign. . . ." Id., ¶ 100. First, the court has already found that conditions at the CFD did not amount to a hostile work environment. Second, it is difficult to see how Ortiz could claim his work environment was so overwhelming, and filled with embarrassment and anxiety, yet remain in that same situation for a 17 months, close to one and a half years. Such a claim strains credibility. In fact, Ortiz was transferred out of Burns' Unit in June of 1998. Def.'s Stmt. of Mat. Facts, ¶ 44. There is no evidence in the record to suggest that Ortiz suffered the type of harassment that was so intolerable that it led to his voluntarily retirement. While the workplace may have been subjectively uncomfortable for Ortiz, it was not "hellish" for purposes of Title VII. See Berry, 260 F.3d at 808; see also Harriston v. Chicago Tribune Co., 992 F.2d 697, 705 (7th Cir.1993). As a result, there is no genuine issue of material fact as to whether Ortiz was constructively discharged. See Robinson, 351 F.3d at 336. Therefore, because there are no material issues of fact as to any of Velez's and Ortiz's Title VII claims, summary judgment is proper as to Defendants.

## III. CONCLUSION

For the reasons stated above, the court grants Defendants' Motion for Summary Judgment.

IT IS SO ORDERED.

ENTER:

*[signature: Charles R. Norgle]*

CHARLES RONALD NORGLE, SR. Judge

United States District Court

DATED: 7-6-05